UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL TAYLOR,

                        Plaintiff,

            -v.-                                          19 Civ. 6754 (KPF)

CITY OF NEW YORK, RICHARD ALVAREZ,              **OPINION AND ORDER**
ANTHONY CHOW, FERNANDO BONILLA,
and THOMAS FABRIZI,

                        Defendants.

---

KATHERINE POLK FAILLA, District Judge:

On August 31, 2016, Plaintiff Michael Taylor was arrested and charged with selling narcotics on a Manhattan street corner. Since then, Plaintiff has consistently maintained that his arrest and subsequent prosecution for narcotics offenses were predicated on false allegations concocted by the New York City Police Department (the "NYPD") officers who arrested him. A jury apparently agreed, acquitting Plaintiff at trial. Following his acquittal, Plaintiff filed this civil rights action against the NYPD officers involved in his arrest — Detective Richard Alvarez, Detective Anthony Chow, Detective Fernando Bonilla, and Lieutenant Thomas Fabrizi (the "Officers") — as well as the City of New York (the "City," and together with the Officers, "Defendants"), asserting claims for false arrest, malicious prosecution, illegal search, malicious abuse of process, and failure to intervene under 42 U.S.C. § 1983, along with related state law claims. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. For the reasons that follow, Defendants' motion is granted in part and denied in part.

**BACKGROUND**[1]

**A.    Factual Background**[2]

On August 31, 2016, at approximately 7:45 p.m., Plaintiff Michael Taylor

was arrested in the vicinity of West 103rd Street between Broadway and

Amsterdam Avenue in Manhattan, New York, for the suspected sale of a

controlled substance to a woman named Deborah Gasparro.  (Def. 56.1 ¶¶ 1-2;

Garcia Decl., Ex. B ("Arrest Report")).  Thereafter, Plaintiff was charged with

two narcotics felonies: (i) criminal sale of a controlled substance in the third

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with Defendants' motion for summary judgment, including Defendants' statement of undisputed material facts pursuant to S.D.N.Y. Local Civil Rule 56.1 ("Def. 56.1" (Dkt. #70)), and Plaintiff's Rule 56.1 counterstatement ("Pl. 56.1" (Dkt. #76)).  The Court also draws from the declarations submitted by the parties and the exhibits attached thereto, which declarations are cited using the convention "[Name] Decl."

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").  Additionally, to the extent that Plaintiff purports to dispute facts in Defendants' Rule 56.1 Statement with inadmissible evidence or with evidence that does not support the proposition for which it is advanced, the Court finds such facts to be true.  *See id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

For ease of reference, the Court refers to Defendants' memorandum of law as "Def. Br." (Dkt. #68); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #74); and Defendants' reply brief as "Def. Reply" (Dkt. #85).

[2]    At the threshold, Plaintiff urges the Court to deny Defendants' motion for summary judgment on the grounds that Defendants support their arguments with citations to their Rule 56.1 statement, rather than with citations to the record.  (Pl. Opp. 14-15).  Plaintiff's suggestion has no merit.  Defendants' Rule 56.1 statement accords with Local Rule 56.1(d), which provides that each assertion of fact made by a party in such a statement "must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Plaintiff presents no argument that Defendants rely on inadmissible evidence in support of their motion.  Thus, the Court declines to disregard Defendants' permissible citations to their Rule 56.1 statement.

degree and (ii) criminally using drug paraphernalia in the second degree. (Garcia Decl., Ex. K ("Criminal Complaint")).

While the parties agree that the precipitating event for Plaintiff's arrest was a brief interaction between Plaintiff and Gasparro, they sharply contest what occurred during the interaction. (*Compare* Def. 56.1 ¶ 2, *with* Garcia Decl., Ex. A ("Pl. Dep.") at 44:8-19). On Defendants' view, Detective Richard Alvarez witnessed Plaintiff engage in a narcotics transaction with Gasparro. (Garcia Decl., Ex. C ("Alvarez Dep.") at 52:5-11). Plaintiff, by contrast, contends that he did not possess any controlled substances and that he was arrested so soon after Gasparro approached him that Alvarez could not possibly have observed an exchange, let alone a narcotics transaction. (Pl. Dep. 44:16-19). This dispute lies at the heart of this case and, to a considerable degree, dictates the Court's resolution of this motion.

### 1.     The Circumstances of Plaintiff's Arrest

On the day of Plaintiff's arrest, Alvarez was on patrol in plainclothes with Lieutenant Thomas Fabrizi, Detective Anthony Chow, and Detective Fernando Bonilla in the vicinity of Manhattan's 24th Precinct. (DePaola Decl., Ex. 1 ("Suppression Hr'g Tr.") at 7:3-24, 10:14-17). Alvarez described the area as "drug prone" and testified that he had made prior drug-related arrests in the neighborhood. (*Id.* at 9:23-10:4). In fact, one of Alvarez's prior arrests in this area had occurred but a half-hour before Plaintiff's, and involved an individual who was apprehended for possession of crack cocaine upon exiting the building

at 868 Amsterdam Avenue — the same address that would lead Alvarez to Gasparro. (*Id.* at 10:18-11:16, 22:9-15).

Shortly after Alvarez arrested this unrelated individual, Bonilla radioed Alvarez to return to the area near 868 Amsterdam Avenue because a female, who was later identified as Gasparro, was trying to enter this address. (Suppression Hr'g Tr. 11:17-24). Upon arriving at the location, Alvarez saw Gasparro exiting the building with Juan Santana, whom Alvarez recognized from previous arrests as a known drug dealer in the community. (*Id.* at 13:11-16, 22:19-23:9). Chow, also in plainclothes, joined Alvarez, and the two officers followed Gasparro and Santana for several blocks. (*Id.* at 33:4-7, 48:13-17). When Gasparro and Santana eventually separated, the officers continued to track Gasparro. (*Id.* at 34:16-35:3, 48:14-25).

Alvarez claims that at some point thereafter, he witnessed Gasparro approach Plaintiff and engage in a narcotics transaction. (Def. 56.1 ¶ 4). More specifically, Alvarez claims that he was standing approximately 10 feet away from Plaintiff on the sidewalk when he observed Gasparro hand Plaintiff money in exchange for a small item that Alvarez believed to be crack cocaine. (Alvarez Dep. 46:7-21, 68:13-20).[3] Immediately following the perceived exchange, Alvarez apprehended Gasparro, who had tucked into her bra a small, clear Ziploc bag filled with a substance that later field-tested positive for crack

---

[3]     Alvarez characterized Plaintiff's interaction with Gasparro differently in the criminal complaint charging Plaintiff with narcotics offenses. There, while recounting the factual basis for the charges against Plaintiff, Alvarez had claimed that he observed Gasparro "hand [Plaintiff] a ziploc[ ] style bag in exchange for a sum of U.S. currency." (Criminal Complaint 1).

4

cocaine.  (Def. 56.1 ¶¶ 6-7, 9-10; Alvarez Dep. 62:12-23).  Alvarez recovered the
Ziploc bag from Gasparro and proceeded to arrest her.  (Def. 56.1 ¶¶ 8, 11).

Meanwhile, approximately two-and-a-half car lengths away from where
Alvarez confronted Gasparro, Chow detained and searched Plaintiff.  (Garcia
Decl., Ex. D ("Chow Dep.") at 38:3-39:3).  After finding Gasparro's Ziploc bag,
Alvarez looked toward Chow and nodded, which Chow understood to mean that
Alvarez had recovered drugs.  (*Id.* at 35:14-23).  Chow then handcuffed and
arrested Plaintiff.  (*Id.* at 39:15-20).  At the time of his arrest, Plaintiff was
holding cash in his hand and had 14 empty, small, yellow-tinted Ziploc bags in
his right pants pocket.  (Def. 56.1 ¶¶ 15-16; Garcia Decl., Ex. H).

Plaintiff provides a very different account of his interaction with
Gasparro.  He contends that, rather than asking him for narcotics, Gasparro
was in fact approaching him to beg for money.  (Pl. 56.1 ¶ 2; Pl. Dep. 34:24-
35:2).  In a charitable gesture, Plaintiff reached into his right pants pocket to
pull out some cash, counted off a dollar, but was arrested before he could hand
her the money.  (Pl. 56.1 ¶¶ 3-4; Pl. Dep. 36:1-10).  Plaintiff estimates that
approximately one minute elapsed between when Gasparro approached him
and when he was arrested.  (Pl. Dep. 44:14-19).  Plaintiff maintains that he
never possessed crack cocaine or any other controlled substance.  (*Id.* at 38:15-
20).  The only items in Plaintiff's pockets at the time of his arrest were the
yellow-tinted Ziploc bags, which differed from the clear bag recovered from
Gasparro.  (Def. 56.1 ¶ 16; Pl. Dep. 39:4-7).  Plaintiff also had eight one-dollar

bills in his hand and three twenty-dollar bills in his wallet. (Garcia Decl., Ex. G; Pl. Dep. 36:11-22).

Following their arrests, Plaintiff and Gasparro were placed in the rear of a prisoner transport van and taken to the 24th Precinct for processing. (Def. 56.1 ¶¶ 17-18). Upon arriving at the precinct, Plaintiff was subjected to an invasive search, which Plaintiff claims entailed removing his clothing, bending over, squatting, and coughing. (Pl. Dep. 51:24-52:5). Plaintiff recalls that Alvarez was present during this search. (*Id.* at 52:15-16).

### 2. Plaintiff's and Gasparro's Criminal Prosecutions

Both Plaintiff and Gasparro were charged with narcotics offenses stemming from their August 31, 2016 arrests. On September 1, 2016, Alvarez signed a criminal complaint charging Plaintiff with two felony narcotics counts: (i) criminal sale of a controlled substance in the third degree and (ii) criminally using drug paraphernalia in the second degree. (Criminal Complaint). Later that evening, Plaintiff was arraigned on these charges and then released from custody on his own recognizance. (Garcia Decl., Ex. L ("Pl. Arraignment Form")). On November 1, 2016, a grand jury sitting in Manhattan indicted Plaintiff on both narcotics offenses. (*Id.*, Ex. O ("Indictment")). Plaintiff's criminal case went to trial, which resulted in Plaintiff's acquittal on May 15, 2018. (*Id.*, Ex. P ("Pl. Certificate of Disposition")).

Separately, on October 5, 2016, Alvarez signed a criminal complaint charging Gasparro with criminal possession of a controlled substance in the seventh degree. (Garcia Decl., Ex. M ("Gasparro Criminal Complaint")). On

October 25, 2016, Gasparro pleaded guilty to this offense and received a sentence of time served. (*Id.*, Ex. N ("Gasparro Certificate of Disposition")).

### B.    Procedural Background

Prior to initiating the instant suit, on July 27, 2018, Plaintiff filed a Notice of Claim with the New York City Comptroller's Office. (Garcia Decl., Ex. Q ("Notice of Claim")). The Notice of Claim alleges, among other violations, that Plaintiff was falsely arrested, falsely imprisoned, illegally searched and seized, and maliciously prosecuted by NYPD officers on August 31, 2016. (*Id.* at 3). Plaintiff testified to the allegations contained in this Notice of Claim at a hearing pursuant to New York General Municipal Law 50-h on October 15, 2018. (Garcia Decl., Ex. R ("50-h Hearing Tr.")).

Plaintiff filed the Complaint in this case on July 19, 2019. (Dkt. #1 (the "Complaint" or "Compl.")). Defendants Alvarez, Chow, and the City of New York filed their Answer to the Complaint on November 8, 2019. (Dkt. #11). Fabrizi and Bonilla answered the Complaint on November 22, 2019. (Dkt. #13). Following the parties' unsuccessful mediation (Dkt. #14), on March 5, 2020, the Court entered a case management plan setting the discovery deadlines in this case (Dkt. #17). Due to the difficulties posed by the COVID-19 pandemic, the Court entered a revised case management plan on June 1, 2020. (Dkt. #23).

This case has been plagued by discovery disputes, nearly all of which were occasioned by Plaintiff's failure to timely comply with his discovery obligations and Court-ordered deadlines. The first issue arose on July 29,

7

2020, when Defendants filed a letter seeking to compel Plaintiff to respond to their discovery requests. (Dkt. #24). On August 7, 2020, Plaintiff explained that he had responded to the outstanding discovery requests (Dkt. #25), which prompted the Court, on August 10, 2020, to dismiss Defendants' motion to compel as moot (Dkt. #26).

On October 5, 2020, just three days before the fact discovery cutoff set by the then-operative case management plan, Defendants filed a second letter motion requesting a conference to address Plaintiff's continued failure to comply with his discovery obligations. (Dkt. #27). Plaintiff opposed Defendants' application on October 9, 2020, mounting several objections to Defendants' requested discovery. (Dkt. #29). On October 13, 2020, the Court issued an endorsement extending the fact discovery deadline and compelling Plaintiff to supplement his discovery responses and provide the additional information requested by Defendants. (Dkt. #30).

On October 21, 2020, Plaintiff moved for reconsideration of the Court's order to compel, arguing that the Court's reasoning rested on a misapprehension of the extent to which Plaintiff had waived his right to object to Defendants' discovery requests going forward. (Dkt. #31). Defendants opposed Plaintiffs' motion for reconsideration on October 27, 2020. (Dkt. #35). After performing an individualized review of Plaintiff's objections, by Order dated November 9, 2020, the Court granted in part and denied in part Plaintiff's motion for reconsideration, thereby clarifying the information that Plaintiff was obligated to produce in response to Defendants' October 5, 2020

8

motion to compel.  (Dkt. #36).  On December 7, 2020, Defendants submitted yet another letter motion, seeking to compel Plaintiff's compliance with the Court's November 9, 2020 Order.  (Dkt. #37).  Without receiving a response from Plaintiff, the Court granted Defendants' motion to compel on December 11, 2020.  (Dkt. #38).

On January 21, 2021, Defendants filed their first letter motion seeking dismissal of the case for failure to prosecute.  (Dkt. #41).  Noting Plaintiff's history of repeatedly failing to respond to Defendants' efforts to contact him, on January 22, 2021, the Court directed Plaintiff to comply with the Court's outstanding discovery orders within the week or face dismissal.  (Dkt. #42).  By letter motion dated February 1, 2021, Defendants renewed their request to dismiss the case for failure to prosecute.  (Dkt. #43).  The following day, Plaintiff opposed Defendants' motion, claiming that his persistent failures to comply with the Court's discovery orders were "due to several extenuating circumstances beyond the control" of counsel.  (Dkt. #44).  In response, the Court ordered Plaintiff to file an *ex parte* letter under seal to substantiate this rationale for noncompliance.  (Dkt. #45).  The Court received Plaintiff's *ex parte* submission on February 10, 2021 (Dkt. #46), and denied Defendants' second motion to dismiss for failure to prosecute that same day (Dkt. #47).

On February 17, 2021, Defendants notified the Court that Plaintiff's decision to withdraw certain of his claims for lost income, physical injuries, and psychological damages obviated the need for a number of documents that Plaintiff had been ordered to produce pursuant to the Court's November 9,

2020 Order.  (Dkt. #48).  Withdrawal of these claims did not, however, absolve Plaintiff of all outstanding production obligations, and so the Court directed Plaintiff on February 17, 2021, to complete his remaining discovery obligations within one week.  (Dkt. #49).

Fact discovery closed on April 8, 2021 (Dkt. # 56, 57), after which the Court held a conference with the parties on May 4, 2021 (*see* Minute Entry of May 4, 2021).  On June 3, 2021, Defendants submitted a status update, informing the Court that the parties' efforts to settle had failed and proposing a briefing schedule for summary judgment practice.  (Dkt. #59).  The following day, the Court issued an endorsement adopting Defendants' proposed briefing schedule.  (Dkt. #60).  On August 26, 2021, Defendants filed their motion for summary judgment and supporting papers.  (Dkt. #67-71).  On November 9, 2021, Plaintiff filed his opposition papers.  (Dkt. #74-76).[4]  On January 6, 2022, Defendants submitted their reply brief.  (Dkt. #85).  As such, Defendants' motion for summary judgment is fully briefed and ripe for review.

## DISCUSSION

Plaintiff asserts both federal and state law claims arising out of the circumstances of his arrest and subsequent prosecution.  He brings the following claims pursuant to 42 U.S.C. § 1983 against the Officers: (i) false

---

[4]     On October 8, 2021, the Court granted Plaintiff's first request for a *nunc pro tunc* extension of time to file his opposition brief.  (Dkt. #73).  Even with this extension, Plaintiff filed his opposition papers four days past the revised deadline, and submitted along with his briefing a second request for a *nunc pro tunc* extension of this filing deadline.  (Dkt. #77).  The Court accepted Plaintiff's late filing, while noting that it perceived this incident to be a continuation of his pattern of inattention to Court-ordered deadlines.  (Dkt. #78).

arrest; (ii) malicious prosecution; (iii) illegal stop and search; (iv) abuse of process; and (v) failure to intervene.  Plaintiff also brings related claims under New York state law against all Defendants for (i) false arrest; (ii) assault and battery; (iii) malicious prosecution; (iv) malicious abuse of process; and (v) failure to intervene.  Plaintiff brings an additional Section 1983 claim against the City of New York for allegedly maintaining a policy, custom, or practice of violating people's rights to be free from illegal searches and seizures.[5]

To preview, the Court will first address the applicable standard for motions for summary judgment under Federal Rule of Civil Procedure 56.  It will then discuss Plaintiff's federal civil rights claims against the Officers, before turning to Plaintiff's federal claim for municipal liability.  In the remainder of the Opinion, the Court will resolve Plaintiff's state law claims.

---

[5]  Plaintiff has affirmatively withdrawn his state law claim for intentional or negligent infliction of emotional distress.  (Pl. Opp. 14).  Moreover, the Court deems Plaintiff to have abandoned his federal excessive force claim (Compl. ¶¶ 90-93) and his state law claim for negligent hiring, retention, and supervision against the City (*id.* at ¶¶ 137-143).

Defendants addressed both Plaintiff's excessive force claim and his negligent hiring, retention, and supervision claim in their briefing.  As to the former claim, Defendants argue that the record contains no evidence suggesting that Plaintiff was subjected to force by any of the Officers.  (Def. Br. 10-11).  With respect to the latter claim, Defendants argue that the record does not establish that the City was on notice of the need to more closely supervise, re-train, or terminate any of the Officers for the actions about which Plaintiff complains.  (*Id.* at 19).  Plaintiff's opposing papers fail to engage with either of these arguments, and appear to wholly ignore the fact that Plaintiff even pleaded these claims.  On this basis, the Court deems Plaintiff's claims for excessive force and negligent hiring, retention, and supervision to be abandoned.  *See Jackson* v. *Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

11

### A.   Motions for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[6]  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322; *see also Selevan* v. *N.Y.*

---

[6]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

*Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the nonmoving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets its initial burden, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial" using affidavits or other evidence in the record, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *accord Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citation omitted). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the nonmoving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d

334, 342 (S.D.N.Y. 2005) (citing *Cnty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

**B.      Plaintiff's Section 1983 Claims Against the Officers**

Plaintiff asserts five Section 1983 claims against the Officers, each alleging violations of his constitutional rights stemming from his August 31, 2016 arrest and ensuing prosecution.  The Court begins by outlining the general principles for establishing a federal civil rights claim under Section 1983, along with the doctrine of qualified immunity, before analyzing each of Plaintiff's claims.

**1.      Civil Rights Actions Under 42 U.S.C. § 1983 and Qualified Immunity**

Plaintiff raises claims of false arrest, malicious prosecution, illegal search, malicious abuse of process, and failure to intervene, all under 42 U.S.C. § 1983.  "[Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."  *City of Oklahoma City* v. *Tuttle*, 471 U.S. 808, 816 (1985).  There are two essential elements to any claim raised under Section 1983: "[i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis* v. *Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).  Furthermore, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983."  *Victory* v. *Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell* v. *Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).  The Second Circuit has defined "personal involvement" to

mean direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts," despite knowing the actions were illegal.  *Provost* v. *City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001); *see also Patterson* v. *City of New York,* No. 14 Civ. 5330 (PKC), 2015 WL 8362702, at *2 (S.D.N.Y. Dec. 8, 2015) ("Personal involvement may arise through direct participation in the claimed conduct, a failure to intervene, or the creation of an unconstitutional policy or practice.").

A valid qualified immunity defense can foreclose liability under Section 1983.  "Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Stephenson* v. *Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (internal quotation marks and citation omitted).  A right is clearly established if "existing law ... placed the constitutionality of the officer's conduct 'beyond debate.'"  *District of Columbia* v. *Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741 (2011)).  "In determining whether a right was so clearly established, the Supreme Court has emphasized that the 'dispositive inquiry ... is whether it would be clear to a *reasonable officer* that his conduct was unlawful *in the situation he confronted.*'"  *Barboza* v. *D'Agata*, 676 F. App'x 9, 12 (2d Cir. 2017) (summary order) (emphases in original) (quoting *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001)).  Qualified immunity protects officers when "their decision was reasonable, even if mistaken";

indeed, it "protect[s] all but the plainly incompetent or those who knowingly

violate the law." *Johnson* v. *Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting

*Hunter* v. *Bryant*, 502 U.S. 224, 229 (1991)).

### 2. False Arrest

Plaintiff claims that he was falsely arrested on August 31, 2016. As

discussed below, there are disputed issues of fact concerning the existence of

probable cause for his arrest that foreclose summary judgment as to all of the

Officers.

### a. Applicable Law

A federal false arrest claim raised under Section 1983 is "substantially

the same as a claim for false arrest under New York law." *Weyant* v. *Okst*, 101

F.3d 845, 852 (2d Cir. 1996). The elements of false arrest under New York law

are: "[i] the defendant intended to confine [plaintiff], [ii] the plaintiff was

conscious of the confinement, [iii] the plaintiff did not consent to the

confinement[,] and [iv] the confinement was not otherwise privileged."

*Ackerson* v. *City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (internal

quotation marks and citation omitted). "The existence of probable cause to

arrest constitutes justification and is a complete defense to an action for false

arrest." *Weyant*, 101 F.3d at 852 (internal quotation marks omitted); *accord*

*Ackerson*, 702 F.3d at 19.

Officers have probable cause to arrest when they have "reasonably

trustworthy information as to facts and circumstances that are sufficient to

warrant a person of reasonable caution in the belief that an offense has been

committed by the person to be arrested." *Ackerson*, 702 F.3d at 19 (internal quotation marks and alterations omitted).  The central inquiry is thus "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Id.* (citation omitted).  There need not have been probable cause for the charge stated at the time of arrest; what matters is whether there was probable cause to arrest for any offense.  *See id.* at 20.

"In the context of [Section] 1983 actions predicated on allegations of false arrest, ... an arresting officer is entitled to qualified immunity so long as 'arguable probable cause' was present when the arrest was made." *Figueroa* v. *Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quoting *Zalaski* v. *City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)).  Arguable probable cause is an objective standard that "exists if either [i] it was objectively reasonable for the officer to believe that probable cause existed, or [ii] officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia* v. *Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Zalaski*, 723 F.3d at 390).  "[W]hether an officer's conduct was objectively reasonable" depends on "the information possessed by the officer at the time of the arrest," not "the subjective intent, motives, or beliefs of the officer." *Id.* (quoting *Amore* v. *Novarro*, 624 F.3d 522, 536 (2d Cir. 2010)).  "Put another way, an arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Figueroa*, 825 F.3d at 100 (citing *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)).  "Therefore, in situations where an officer

may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." *Caldarola* v. *Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (citation omitted).

### b. The Court Denies Summary Judgment as to Plaintiff's False Arrest Claim

Defendants argue that summary judgment should be granted as to Plaintiff's claim of false arrest because the arrest was supported by probable cause — or at least arguable probable cause — based on Alvarez's observation of a furtive exchange between Plaintiff and Gasparro, combined with Alvarez's ensuing recovery of narcotics from Gasparro. (Def. Br. 6-8). Defendants also contend that Plaintiff's false arrest claim cannot survive with respect to Fabrizi and Bonilla for the additional reason that they were not at the scene of Plaintiff's arrest, or otherwise personally involved. (*Id.* at 4-5). In opposition, Plaintiff disputes Defendants' articulated basis for probable cause, claiming that Alvarez could not possibly have observed an exchange of any kind with Gasparro because Plaintiff was arrested so quickly after she approached him. (Pl. Opp. 18-21). Plaintiff also argues that the record supports Fabrizi's and Bonilla's personal involvement in his arrest. (*Id.* at 15).

As the Court will explain, there is a genuine dispute as to the existence of probable cause to arrest Plaintiff. Furthermore, triable issues of fact exist as to whether Bonilla and Fabrizi were sufficiently personally involved in Plaintiff's arrest to give rise to liability on this claim. Accordingly, none of the Officers is entitled to summary judgment on Plaintiff's false arrest claim.

18

### i.    Probable Cause

"Probable cause is a mixed question of law and fact."  *Dufort* v. *City of New York*, 874 F.3d 338, 348 (2d Cir. 2017) (citation omitted).  Generally speaking, "[q]uestions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury."  *Id.* (citation omitted).  "However, 'where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court.'"  *Id.* (quoting *Walczyk* v. *Rio*, 496 F.3d 139, 157 (2d Cir. 2007)).

Here, the parties present materially different versions of the key interaction between Plaintiff and Gasparro that allegedly gave the Officers probable cause to arrest Plaintiff.  Defendants argue that there was probable cause to arrest Plaintiff because Alvarez saw Plaintiff reach into his pants pocket and engage in a hand-to-hand transaction with Gasparro, who was later found to possess crack cocaine.  (Def. Br. 6-7).  Yet, whether any exchange, at all, took place between Plaintiff and Gasparro is in genuine dispute.  In contrast with Defendants' account of the events, Plaintiff testified in his deposition that he interacted with Gasparro for "maybe a minute" before he was arrested and that he never handed her any money or even touched her hands.  (Pl. Dep. 43:4-8, 44:16-19).  Aside from Alvarez, no other officer recalls observing any exchange between Plaintiff and Gasparro, including Chow, the only other officer at the scene of the arrest.  (*See* Chow Dep. 26:15-17 (Q: "Did you observe that exchange [between Plaintiff and Gasparro] yourself?" A: "No.")).

At this stage of the proceedings, the Court must construe the facts in the light most favorable to the nonmoving party.  Thus, adopting Plaintiff's version of events, he could not have engaged in an exchange with Gasparro at the time of his arrest.  (*See* Pl. Dep. 43:4-8).  Without the exchange, the only evidence supporting probable cause for Plaintiff's arrest were the Ziploc bags and $68 of cash that were recovered from his person, and the fact that Gasparro was later found to possess crack cocaine.  These facts are insufficient to establish probable cause to arrest Plaintiff, especially considering the circumstances suggesting that the Officers had reason to believe that Gasparro had acquired the drugs from someone other than Plaintiff.  Notably, moments before interacting with Plaintiff, the Officers observed Gasparro in the presence of a known drug dealer after exiting an address where someone had been arrested by the Officers with crack cocaine earlier that evening.  (Pl. Opp. 20). Furthermore, the Ziploc bags found in Plaintiff's pants pocket were empty and yellow-tinted, whereas the Ziploc bag containing crack cocaine that was recovered from Gasparro was clear.  (*See id.* at 20-21).  This leaves Defendants with little more than the mere fact that Plaintiff had a seconds-long interaction with someone who possessed drugs, which is plainly insufficient to establish probable cause to arrest.  *See Perez* v. *Duran*, 962 F. Supp. 2d 533, 538 (S.D.N.Y. 2013) ("Physical proximity to criminal behavior without more is insufficient to establish probable cause."); *see also Virgil* v. *City of New York*, No. 17 Civ. 5100 (PKC) (SMG), 2019 WL 4736982, at *4 (E.D.N.Y. Sept. 27, 2019) ("[M]ere proximity to 'others independently suspected of criminal activity,

does not, without more, give rise to probable cause'" (quoting *Burgess* v. *City of New York,* No. 15 Civ. 5525 (RRM) (VMS), 2018 WL 1581971, at *3 (E.D.N.Y. Mar. 29, 2018)).

Plaintiff cites two analogous cases that support the Court's finding that the existence of probable cause cannot be established as a matter of law on this record. (Pl. Opp. 21). In *Perez* v. *Duran*, Judge Koeltl denied summary judgment on a false arrest claim, where an officer's purported probable cause was based on his alleged observation of an exchange of money and a small object between the plaintiff and his father, who was found to be in possession of crack cocaine. 962 F. Supp. 2d at 536-37. Following the arrest of both the plaintiff and his father, the officers recovered $444 dollars in cash from the plaintiff, but no drugs. *Id.* at 536 The plaintiff disputed that he had exchanged anything with his father during their interaction and contended that he had merely shaken his father's hand. *Id.* Finding there to be disputed issues of material fact as to the circumstances of the plaintiff's arrest, the court drew factual inferences in the plaintiff's favor and concluded that there was insufficient evidence to establish probable cause as a matter of law. *Id.* at 539-40. In so holding, Judge Koeltl noted that "defendant cite[d] no case that suggests that probable cause to arrest a suspected drug seller exists based on the recovery of drugs from a suspected buyer without evidence of any exchange between a suspected seller and a suspected buyer found to possess drugs." *Id.* at 539.

Similarly, in *Burgess* v. *City of New York,* Judge Mauskopf denied summary judgment on a false arrest claim, where a plaintiff's version of the facts cast doubt on the credibility of the officer's basis for probable cause. 2018 WL 1581971, at *3.  In *Burgess*, the officers claimed that they saw the plaintiff engage in an exchange with someone who was later found to possess crack cocaine, which led to the arrest of both individuals.  *Id.* at *1.  By contrast, the plaintiff admitted to greeting the other individual with a handshake, but denied touching his hand again or exchanging anything with him at any point.  *Id.* at *2.  The plaintiff argued that the officers could not possibly have observed the handshake because they arrived five minutes after the plaintiff greeted the other individual.  *Id.*  On these facts, Judge Mauskopf found that critical facts were in dispute, which were not appropriately resolved on summary judgment.  *Id.* at *3-4.

A similar conclusion is warranted in this case, where a "jury crediting [Plaintiff's] version of events would be left without critical information going to probable cause."  *Burgess*, 2018 WL 1581971, at *4; *see also Virgil*, 2019 WL 4736982, at *3-5 (denying summary judgment on false arrest claim where, on plaintiff's version of events, officer "merely witnessed Plaintiff shake hands with [another] in a drug-prone area").  The jury could credit Plaintiff's claim that he interacted with Gasparro for a matter of seconds and never touched her hand before he was arrested.  And even if Alvarez did see their hands touch, the jury could nevertheless credit Plaintiff's contention that Gasparro approached him begging for money and that he never handed her a small object.  If the jury

22

were to make either finding, it could also find that the Officers lacked probable cause to arrest Plaintiff.  These factual disputes concerning the circumstances of Plaintiff's arrest preclude summary judgment on his false arrest claim.

### ii.        Individual Participation in Plaintiff's Arrest

Defendants argue that Fabrizi and Bonilla are entitled to summary judgment on Plaintiff's false arrest claim for the additional reason that they were not personally involved in Plaintiff's arrest.  (Def. Br. 4-5).  Plaintiff disagrees and claims that both Fabrizi and Bonilla were sufficiently involved in his arrest in ways other than directly seizing or arresting him so as to give rise to liability.  (Pl. Opp. 15).  The Court finds there to be triable issues of fact as to both Bonilla's and Fabrizi's personal involvement.

It is undisputed that Fabrizi and Bonilla were not at the scene when Plaintiff was seized (Def. 56.1 ¶¶ 19, 20),[7] but were members of the field team patrolling for narcotics offenses in the area where Plaintiff was arrested on

---

[7]     Plaintiff purports to dispute these paragraphs of Defendants' Rule 56.1 statement; however, the record evidence he cites to substantiate his objections does not suggest that Fabrizi or Bonilla was physically present at the scene when Plaintiff was arrested. (*See* Pl. 56.1 ¶¶ 19-20).  Plaintiff cites to his arrest report, which lists Fabrizi as the approving supervisor and Bonilla as the officer who entered the report information, but neither designation implies that these officers were, in fact, present at the scene of Plaintiff's arrest.  (Arrest Report).  To suggest that Fabrizi was present at the scene of Plaintiff's arrest, Plaintiff cites an excerpt of Fabrizi's testimony discussing his typical practice for approving an arrest *when he wasn't initially present at the scene.*  (Garcia Decl., Ex. J ("Fabrizi Dep.") at 106:16-23).  For his part, Bonilla testified that he was across the street from 868 Amsterdam Avenue at the time of Plaintiff's arrest.  (*Id.*, Ex. I ("Bonilla Dep.") at 14:8-14).  The portion of Bonilla's testimony cited by Plaintiff establishes that Bonilla arrived at the scene of Plaintiff's arrest *after* Alvarez and Chow had taken Plaintiff into custody.  (*Id.* at 26:22-27:9).  Indeed, Detective Chow testified that no other members of his team were within a 50-foot radius when he arrested Plaintiff.  (Chow Dep. 30:8-10).  As such, the Court deems it undisputed that neither Fabrizi nor Bonilla was present at the scene when Plaintiff was arrested.  As the Court will discuss, however, both officers are alleged to have arrived at the scene after Plaintiff was detained.

August 31, 2016 (Alvarez Dep. 29:5-10).  These officers' mere affiliation with the field unit that arrested Plaintiff does not, by itself, constitute their direct participation in his arrest.  *Rodriguez* v. *City of New York*, 291 F. Supp. 3d 396, 410 (S.D.N.Y. 2018) ("Courts have rejected the notion that every member of a team of officers is, by default, personally involved in every arrest effected by the team." (collecting cases)).  As such, the Court must discern whether Fabrizi's and Bonilla's precise actions vis-à-vis Plaintiff were sufficient to render them personally involved in Plaintiff's arrest.

Bonilla was a detective assigned to the unit performing surveillance operations for narcotics offenses in the area where Plaintiff was arrested. (Bonilla Dep. 10:4-21, 11:4-12:17).  According to Alvarez, Bonilla was the officer who radioed him to return to 868 Amsterdam because he saw Gasparro attempting to enter the building.  (Suppression Hr'g Tr. 11:19-12:9).  Bonilla testified that he was not a witness to Plaintiff's arrest because he was stationed around the corner at 868 Amsterdam Avenue at the time.  (Bonilla Dep. 16:3-13).  Upon learning that Plaintiff had been taken into custody, Bonilla headed to the scene of the arrest and assisted Alvarez by placing property that was recovered from the arrestees in an envelope and waiting for the prisoner van to arrive.  (*Id.* at 26:22-27:9).  Bonilla also testified that he entered the information into Plaintiff's arrest report and vouchered the crack cocaine recovered from Gasparro, as well as administered the field test report of these same drugs.  (*Id.* at 65:12-66:19; Garcia Decl., Ex. E (Gasparro Property Invoice); *id.*, Ex. F (Field Test Report)).

24

These facts concerning Bonilla's involvement raise triable issues of fact as to whether Bonilla directly participated in Plaintiff's arrest. As the Second Circuit has explained, "ordering or helping others to do the unlawful acts, rather than doing them [oneself]," can constitute "direct participation." *Provost*, 262 F.3d at 155. Particularly relevant to Bonilla, courts in this District have found that filling out arrest paperwork can suffice to demonstrate direct participation in an arrest. *See, e.g., Shaheed* v. *City of New York*, 287 F. Supp. 3d 438, 449 n.6 (S.D.N.Y. 2018); *Arbuckle* v. *City of New York*, No. 14 Civ. 10248 (ER), 2016 WL 5793741, at *13 (S.D.N.Y. Sept. 30, 2016); *Marom* v. *City of New York*, No. 15 Civ. 2017 (PKC), 2016 WL 916424, at *16 (S.D.N.Y. Mar. 7, 2016). More than just completing paperwork, Bonilla helped corral Plaintiff's personal property following his arrest and admitted that he "definitely assisted" in the arrest of Plaintiff, even though he could not recall the specifics. (Bonilla Dep. 63:22-64:2). Additionally, Bonilla conceivably had reason to know that Gasparro might have acquired narcotics from someone other than Plaintiff, as he was the officer who radioed Alvarez to return to the vicinity of 868 Amsterdam Avenue after seeing Gasparro attempt to enter the building. (Suppression Hr'g Tr. 11:19-12:9). The Court thus cannot determine Bonilla's personal involvement in Plaintiff's arrest as a matter of law and denies summary judgment as to Bonilla on this claim.

Fabrizi was the lieutenant with supervisory responsibility over the field team that arrested Plaintiff. (Fabrizi Dep. 116:6-8). "[A] defendant in a [Section] 1983 action may not be held liable for damages for constitutional

violations merely because he [or she] held a high position of authority." *Black* v. *Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon* v. *City of New Haven*, 720 F.3d 133, 138-39 (2d Cir. 2013). As the Second Circuit has recently confirmed, "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti* v. *Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 676 (2009)). A supervisor's "mere knowledge" of a subordinate's unconstitutional behavior is insufficient "because that knowledge does not amount to the supervisor's violating the Constitution." *Id.* at 616-17 (internal quotation marks and alterations omitted) (quoting *Iqbal*, 556 U.S. at 677). "The violation must be established against the supervisory official directly." *Id.* at 618.

On this standard, Plaintiff must show that Fabrizi's own conduct violated Plaintiff's constitutional rights, not merely that he supervised others who committed a violation. Here, the record contains evidence suggesting that Fabrizi affirmatively approved Plaintiff's arrest, thereby personally sanctioning the conduct that allegedly violated Plaintiff's constitutional rights. *First,* Fabrizi was listed as the approving officer of Plaintiff's arrest paperwork. (Arrest Report 3). *Second,* although Fabrizi does not have an independent recollection of Plaintiff's arrest, he testified that it was his general practice to make himself present at an arrest scene and approve arrests that were made by his unit. (Fabrizi Dep. 106:19-23). Typically, upon arriving at a scene,

Fabrizi would approve arrests based on the information he received from the arresting officer.  (*Id.* at 106:24-107:9).  *Third*, Plaintiff's testimony provides some support that Fabrizi followed this general practice, as he recounted that at some point after he was placed in handcuffs, Fabrizi arrived at the scene of the arrest in the van that later transported him to the 24th Precinct.  (Pl. Dep. 45:2-5, 74:9-12).

At the summary judgment stage, when all reasonable inferences must be drawn in favor of the nonmoving party, the Court cannot conclude on the present record that Fabrizi was not personally involved in Plaintiff's arrest. There is a triable issue of fact as to whether Fabrizi arrived at the scene of the arrest and affirmatively approved Plaintiff's arrest.  If proven true, courts have found such conduct to constitute direct involvement in an arrest.  *See Vett* v. *City of New York*, No. 20 Civ. 2945 (CM), 2022 WL 47231, at *10 (S.D.N.Y. Jan. 5, 2022) ("That [the supervising officer] approved Plaintiff's arrest but was not present at the scene to physically execute Plaintiff's arrest does not negate his participation in the arrest or that he intended to cause Plaintiff to be confined."); *see also Harris* v. *City of New York*, No. 15 Civ. 8456 (CM), 2017 WL 6501912, at *4 (S.D.N.Y. Dec. 15, 2017) (finding an officer who "verified" an arrest — that is, concluded that the officers had probable cause to effectuate an arrest — to be a direct participant in an arrest).  The Court acknowledges that a supervising officer's mere signature on arrest paperwork, in isolation, is likely to be insufficient to create a genuine dispute of material fact as to that officer's personal involvement in an arrest.  *See Drayton* v. *City of New York*,

27

No. 17 Civ. 7091 (RRM) (RLM), 2020 WL 2615930, at *5 (E.D.N.Y. May 20, 2020) (granting summary judgment to officer on false arrest claim where the only evidence of personal involvement was his signature on arrest documentation); *Rodriguez* v. *City of New York*, No. 08 Civ. 4173 (RRM) (RLM), 2012 WL 1059415, at *9 (E.D.N.Y. Mar. 28, 2012) (same).  But here, the disputed facts regarding Fabrizi's personal involvement in Plaintiff's arrest go beyond the mere appearance of his name on the arrest report to include his actual decision to approve Plaintiff's arrest.  Given the evidence permitting the inference that Fabrizi personally signed off on Plaintiff's arrest soon after he had been detained, the Court cannot conclude as a matter of law that Fabrizi was not personally involved in Plaintiff's arrest or that Plaintiff seeks to hold him liable merely for his role as a supervisor.  Accordingly, summary judgment is denied as to Fabrizi on Plaintiff's false arrest claim.[8]

---

[8]     The Court acknowledges the line of cases establishing the "fellow officer rule," which embodies the principle that an officer may be shielded "from liability for false arrest if the officer relies on a fellow officer who vouches for probable cause."  *Cruz* v. *City of New York*, 232 F. Supp. 3d 438, 458 (S.D.N.Y. 2017) (quoting *Golphin* v. *City of New York*, No. 09 Civ. 1015 (BSJ), 2011 WL 4375679, at *2 (S.D.N.Y. Sept. 19, 2011)); *see also United States* v. *Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("[A]n arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials.").  The Court perceives two issues with applying the fellow officer rule to Fabrizi on this motion, even though the record suggests he may have relied on Alvarez's recitation of probable cause in approving Plaintiff's arrest.  *First*, Defendants do not advocate for the application of this principle, and instead rely principally on the fact that Fabrizi was not at the scene of the arrest when Plaintiff was detained.  (*See* Def. Br. 4-5).  As already discussed, the Court does not find this fact to be dispositive of Fabrizi's personal involvement.  *Second*, during his deposition, Fabrizi could not recall the events of August 31, 2016, or the contents of any conversation he might have had with any officer prior to approving Plaintiff's arrest.  (Fabrizi Dep. 52:9-18; 131:5-12).  Left only to speculate as to the information that Fabrizi might have received from a fellow officer regarding Plaintiff's conduct prior to his arrest, the Court declines to presume that Fabrizi reasonably (or unreasonably) approved Plaintiff's arrest in reliance on information he received from an officer at the scene.  Instead, this will be a matter for trial.

### iii.     Qualified Immunity

Defendants additionally argue that the Officers are entitled to qualified immunity because they had at least arguable probable cause to arrest Plaintiff based on Alvarez's observations.  (Def. Br. 7-8).  It is up to a jury to resolve disputed issues of fact regarding the circumstances of Plaintiff's arrest in order to determine whether qualified immunity applies.  *See McClellan* v. *Smith*, 439 F.3d 137, 149 (2d Cir. 2006) ("[R]esolution of genuine factual issues is inappropriate on motions for summary judgment based on qualified immunity.").  Defendants' qualified immunity argument relies on the proposition that Alvarez witnessed an exchange of some object for money.  As this central contention is disputed, the Court cannot conclude that probable cause existed or, by extension, grant the Officers qualified immunity on Plaintiff's false arrest claim.

### 3.     Malicious Prosecution

Plaintiff next claims that the Officers maliciously prosecuted him for crimes he did not commit.  As detailed in the remainder of this section, this claim survives against the subset of Officers who can be said to have initiated Plaintiff's prosecution.

### a.     Applicable Law

To prevail on a Section 1983 claim for malicious prosecution, a plaintiff must demonstrate both (i) a Fourth Amendment violation and (ii) the common-law elements of the tort of malicious prosecution.  *See Mitchell* v. *City of New York*, 841 F.3d 72, 79 (2d Cir. 2016).  New York law requires a plaintiff to

29

demonstrate that "[i] the defendant initiated a prosecution against plaintiff, [ii] without probable cause to believe the proceeding can succeed, [iii] the proceeding was begun with malice, and [iv] the matter terminated in plaintiff's favor." *Rentas* v. *Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (internal quotation marks and alterations omitted).  A claim for malicious prosecution under Section 1983 requires the additional element of "[v] a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

The existence of probable cause is a defense to a claim of malicious prosecution.  *See Savino* v. *City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).  Of note, "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury* v. *Wertman*, 721 F.3d 84, 95 (2d Cir. 2013) (citation omitted).  "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd* v. *City of New York*, 336 F.3d 72, 76 (2d Cir. 2003); *see also Posr* v. *Ct. Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that [the charged individual] could be successfully prosecuted.  Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim[.]").

"Once a suspect has been indicted ... the law holds that the Grand Jury action creates a presumption of probable cause." *Rothstein* v. *Carriere*, 373

F.3d 275, 282-83 (2d Cir. 2004) (quoting *Colon* v. *City of New York*, 60 N.Y.2d 78, 82 (1983)).  "The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith."  *Id.* at 283 (quoting *Colon*, 60 N.Y.2d at 82-83).  "Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have lied in order to secure an indictment, and a jury could reasonably find that the indictment was secured through bad faith or perjury, the presumption of probable cause created by the indictment may be overcome.  *Manganiello* v. *City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process."  *Id.* (internal quotation marks and citation omitted).

"[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment," *Savino*, 331 F.3d at 73, and the law requires the plaintiff "to establish what occurred in the grand jury, and … that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially,'" *Rothstein*, 373 F.3d at 284 (quoting *Colon*, 60 N.Y.2d at 82).  *See also Thorpe* v. *Duve*, No. 20-3679, 2022 WL 332804, at *1 (2d Cir. Feb. 4, 2022) (summary order)

31

("[W]here a plaintiff was indicted by a grand jury, summary judgment in the defendants' favor is appropriate if the plaintiff fails to provide evidence from which a reasonable jury could infer that the defendants committed fraud or perjury, suppressed evidence, or otherwise acted in bad faith to procure the plaintiff's indictment by a preponderance of the evidence[.]").  Plaintiff cannot satisfy this burden "with mere 'conjecture' and 'surmise' that [the] indictment was procured as a result of conduct undertaken by the defendants in bad faith."  *Savino*, 331 F.3d at 73 (quoting *Bryant* v. *Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also Brandon* v. *City of New York*, 705 F. Supp. 2d 261, 273 (S.D.N.Y. 2010) (collecting cases for the same proposition).  "Because 'accusers must be allowed room for benign misjudgments,' the New York Court of Appeals has held that the law 'places a heavy burden on malicious prosecution plaintiffs.'"  *Rothstein*, 373 F.3d at 282 (quoting *Smith-Hunter* v. *Harvey*, 95 N.Y.2d 191, 195 (2000)).

>         **b.    The Court Denies Summary Judgment as to Plaintiff's
>                 Malicious Prosecution Claim Against Alvarez and Bonilla,
>                 But Grants as to Chow and Fabrizi**

Here, it is undisputed that a criminal proceeding was initiated against Plaintiff, that it terminated in Plaintiff's favor, and that he suffered a liberty restraint.  In seeking to rebut the presumption of probable cause arising from his indictment, Plaintiff's central contention is that the grand jury proceedings were tainted by Alvarez's fabricated observation of a narcotics exchange.  (Pl. Opp. 22-24).  The Court concludes that Plaintiff has rebutted the presumption

of probable cause arising from his Indictment, but that only Alvarez and Bonilla can be deemed to have "initiated" Plaintiff's malicious prosecution.

### i.      Probable Cause

In asserting the existence of probable cause to prosecute Plaintiff, Defendants point to the same facts that supposedly underpin their probable cause to arrest him. (Def. Br. 7). Defendants' attempt to stretch their alleged probable cause to arrest into probable cause to prosecute necessarily fails, as the Court has already decided that there are issues of fact which, if resolved in Plaintiff's favor, indicate that the Officers lacked probable cause to arrest Plaintiff in the first instance. *See supra* Section B.2.b.i. If the jury credits Plaintiff's version of events, it follows *a fortiori* that Defendants lacked probable cause to prosecute Plaintiff. *See Coleman* v. *City of New York*, 585 F. App'x 787, 789 (2d Cir. 2014) (summary order) ("Where the question of whether an arresting officer had probable cause is predominantly factual in nature, as where there is a dispute as to the pertinent events, the existence *vel non* of probable cause is to be decided by the jury." (quoting *Murphy* v. *Lynn*, 118 F.3d 938, 947 (2d Cir. 1997))).

Defendants also argue that Plaintiff has failed to rebut the presumption of probable cause that flows from Plaintiff's Indictment. (Def. Br. 9-10; Def. Reply 6-7). Plaintiff rejoins that the Indictment was procured by perjury, as evidenced by inconsistencies in Alvarez's sworn recollections of the events of Plaintiff's arrest. (Pl. Opp. 23-24). Namely, Alvarez attested in the Criminal Complaint to his observation that "Gasparro hand[ed] [Plaintiff] a ziploc[] style

33

bag in exchange for a sum of U.S. currency." (Criminal Complaint 1). Alvarez directly contradicts this account in subsequent testimony, when he recounted that it was Plaintiff who handed a small item to Ms. Gasparro in exchange for money (Alvarez Dep. 45:15-21, 52:7-11), and that he was unable to discern the characteristics of the item that was exchanged (*id.* at 68:13-69:9). Plaintiff extrapolates from Alvarez's inconsistent recollection that the Indictment must have been predicated on false and misleading information. (Pl. Opp. 24).

Although it is a close call, the Court finds that Alvarez's testimonial inconsistency, in conjunction with Plaintiff's testimony undercutting Alvarez's version of events, rebuts the presumption of probable cause arising from the Indictment. Defendants contend that Plaintiff has proffered no evidence, whatsoever, going to what occurred in the grand jury. (Def. Reply 6). The Court disagrees, as Plaintiff has argued that Alvarez lied to the District Attorney by including fabricated information in the Criminal Complaint, which was used to charge Plaintiff. *See Colon*, 60 N.Y.2d at 82-83 ("The presumption [of probable cause arising from an indictment] may be overcome … by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney[.]"). It is true that "where a plaintiff's only evidence to rebut the presumption of the indictment is his version of events, courts will find such evidence to be nothing more than 'mere conjecture and surmise that [the plaintiff's] indictment was procured as a result of conduct undertaken by the defendants in bad faith,' which is insufficient to rebut the presumption of probable cause." *Brandon*,

34

705 F. Supp. 2d at 273 (citation omitted); *see also id.* (explaining that the Second Circuit has set forth a "competing testimony plus" standard to assess whether a plaintiff has rebutted the presumption of probable cause (citing *Boyd*, 336 F.3d 72)).  Significantly, however, Plaintiff's attempt to rebut the Indictment's presumption is not limited to his testimony, as Plaintiff's version of events is supplemented by Alvarez's flatly contradictory recollections of the circumstances of Plaintiff's arrest.  A reasonable jury could credit Plaintiff's version of events and conclude from Alvarez's inconsistent sworn statements that he lied about observing a narcotics exchange between Plaintiff and Gasparro.  This would constitute precisely the type of bad-faith action sufficient to taint the grand jury proceedings and rebut the presumption of probable cause that resulted therefrom.  *See Minott* v. *Duffy*, No. 11 Civ. 1217 (KPF), 2014 WL 1386583, at *17-19 (S.D.N.Y. Apr. 8, 2014) (denying summary judgment on malicious prosecution claim where plaintiff alleged that officer included false evidence in criminal complaint); *cf. Scotto* v. *Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) ("[I]t would be objectively unreasonable for [an officer] to believe he had probable cause to arrest [plaintiff] if [the officer] himself fabricated the grounds for arrest.").

### ii.     Malice

Defendants' arguments in favor of summary judgment on Plaintiff's malicious prosecution claims go exclusively to the issue of probable cause.  As such, neither side specifically addresses the malice element.  Regardless, the

Court need not belabor the analysis, as it is clear there exists a triable issue of fact on Defendants' malicious intent.

"Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Lowth* v. *Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli* v. *Stamberg*, 44 N.Y.2d 500, 502-03 (1978)). "[A] lack of probable cause generally creates an inference of malice." *Manganiello*, 612 F.3d at 163; *see also Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) ("[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment."). Here, malice may be inferred in light of the evidence suggesting that the probable cause to arrest and prosecute Plaintiff rested on Alvarez's fabricated allegations.

### iii.    Commencement of Criminal Proceedings

Defendants also do not argue that summary judgment should be granted as to those Officers who did not "initiate" Plaintiff's prosecution. Despite the lack of argument on this point, the record establishes that only Alvarez and Bonilla can be considered to have initiated Plaintiff's criminal proceedings.

To initiate or continue a criminal proceeding, "a defendant must do more than report the crime or give testimony. He must 'play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Manganiello*, 612 F.3d at 163 (alteration omitted) (quoting *Rohman*, 215 F.3d at 217). A jury may permissibly find that a defendant

initiated a prosecution where he "filed the charges" or "prepared an alleged false confession and forwarded it to prosecutors." *Manganiello*, 612 F.3d at 163 (alterations omitted) (quoting *Ricciuti*, 124 F.3d at 130). Where the defendant in a malicious prosecution action is a police officer, "courts have found a triable issue of fact as to the initiation element where the defendant-officer brought formal charges and had the person arraigned, filled out complaining and corroborating affidavits, swore to and signed a felony complaint, or created false information and forwarded it to prosecutors." *Espada* v. *Schneider*, 522 F. Supp. 2d 544, 553 (S.D.N.Y. 2007); *accord Llerando-Phipps* v. *City of New York*, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005). "Additionally, a defendant initiates a prosecution by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." *Israel* v. *City of New York*, No. 16 Civ. 6809 (PGG), 2018 WL 11219076, at *5 (quoting *Aguirre* v. *City of New York*, No. 15 Civ. 6043 (PKC), 2017 WL 4236552, at *9 (E.D.N.Y. Sept. 22, 2017)).

Here, there is no evidence to support that either Fabrizi or Chow engaged in the types of actions that could constitute initiation of criminal proceedings. Fabrizi was the supervising lieutenant of the field unit that arrested Plaintiff and was the officer who signed off on the property invoices incident to Plaintiff's and Gasparro's arrests. (Arrest Report; Gasparro Property Invoice; Garcia Decl., Ex. G-H). Chow detained Plaintiff at the scene of the arrest and was the invoicing officer for the property recovered from Plaintiff. (Chow

37

Dep. 39:15-20; Garcia Decl., Ex. G-H).  Beyond these facts, there is no indication that Fabrizi or Chow played an active role in Plaintiff's prosecution or had a hand in passing along fabricated information to the District Attorney. *See Israel*, 2018 WL 11219076, at *7 ("[A]pproving reports and vouchers is not the type of 'active role' that courts have typically relied on for this element of a malicious prosecution claim.").

The Court reaches the opposite conclusion with respect to Alvarez and Bonilla.  Alvarez was the officer who signed the Criminal Complaint (Criminal Complaint), while Bonilla was the officer who entered the information into the arrest form (Arrest Report; Bonilla Dep. 65:12-66:19).  Both of these documents relay that Plaintiff engaged in an exchange with Gasparro, a fact Plaintiff contends was false.  (Arrest Report; Criminal Complaint).  If a jury were to credit Plaintiff's version of events, a reasonably corollary would be that both officers knowingly input false information into documents that contributed to the District Attorney's decision to charge Plaintiff.  *See Aguirre*, 2017 WL 4236552, at *9 (denying summary judgment against officer who "entered data into the NYPD online arrest report form" that was later provided to the District Attorney's Office); *see also Llerando-Phipps,* 390 F. Supp. 2d at 383 ("[A]n arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." (internal quotation marks omitted)). Because the record contains evidence suggesting that Alvarez and Bonilla played a role in swearing out Plaintiff's criminal complaint and in creating false

information that was passed onto prosecutors, there are triable issues of fact as to whether they initiated Plaintiff's prosecution.

### iv.      Qualified Immunity

Defendants argue that qualified immunity should preclude Plaintiff's malicious prosecution claims against the Officers.  (Def. Br. 7-8).  But, as discussed *supra*, the parties dispute whether his prosecution was underpinned by probable cause.  "[W]here, as here, there is a question of fact as to whether defendants acted with malice in initiating a prosecution against plaintiffs, summary judgment on qualified immunity would be inappropriate."  *Davis* v. *City of New York*, 373 F. Supp. 2d 322, 338 (S.D.N.Y. 2005); *see also Manganiello*, 612 F.3d at 165 (finding qualified immunity unavailable when an officer-defendant "misrepresented the evidence to the prosecutors").  As such, the Court declines to find that Alvarez and Bonilla are entitled to qualified immunity on Plaintiff's malicious prosecution claims.

### 4.      Unlawful Search

Next, Plaintiff claims that he was subjected to an unlawful strip-search and attendant cavity inspection upon arriving at the 24th Precinct following his arrest.  (Pl. Opp. 24-25).  Summary judgment is inappropriate on this claim as to the Officers who were personally involved in this search.

### a.      Applicable Law

The Second Circuit has defined several terms that are relevant to Plaintiff's unlawful search claim: "[i] a 'strip search' occurs when a suspect is required to remove his clothes; [ii] a 'visual body cavity search' is one in which

the police observe the suspect's body cavities without touching them (as by having the suspect … bend over, or squat and cough, while naked); [and] [iii] a 'manual body cavity search' occurs when the police put anything into a suspect's body cavity, or take anything out." *Gonzalez* v. *City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013) (citing *People* v. *Hall*, 10 N.Y.3d 303, 306-07 (2008)); *accord Sloley* v. *VanBramer*, 945 F.3d 30, 36-37 (2d Cir. 2019).

The Fourth Amendment to the Constitution of the United States provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Riley* v. *California*, 573 U.S. 373, 381-82 (2014) (quoting *Brigham City* v. *Stuart*, 547 U.S. 398, 403 (2006)).

Defendants justify any search that was conducted on Plaintiff as a search performed incident to a lawful arrest. (Def. Br. 9). Typically, a search requires a warrant in order to be reasonable under the Fourth Amendment; however, the search-incident-to-arrest doctrine is an exception to the Fourth Amendment's warrant requirement. *See United States* v. *Diaz*, 854 F.3d 197, 205 (2d Cir. 2017). Under this doctrine, the lawful arrest itself establishes the legality of the search, which means that an unlawful search claim turns on the existence of probable cause. *See United States* v. *Robinson*, 414 U.S. 218, 235 (1973); *accord Corley* v. *Vance*, 365 F. Supp. 3d 407, 443 (S.D.N.Y. 2019).

To determine whether a particular search incident to a lawful arrest may be excepted from the Fourth Amendment's warrant requirement, courts "examine the degree to which [the search] intrud[es] upon an individual's privacy and the degree to which [it is] needed for the promotion of legitimate governmental interests." *Sloley*, 945 F.3d at 37 (citation omitted).  Employing this analysis, the Second Circuit has held that the "Fourth Amendment requires an individualized 'reasonable suspicion that a misdemeanor arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest' before she may be lawfully subjected to a strip search." *Hartline* v. *Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (internal alterations omitted) (quoting *Weber* v. *Dell*, 804 F.2d 796, 802 (2d Cir. 1986)).  Although *Hartline* concerned arrests for misdemeanor offenses, "[t]his court agrees with other courts in the circuit which have concluded that the same standard applies to felony arrestees." *Cannon* v. *Port Auth. of N.Y. & N.J.*, No. 15 Civ. 4579 (RA), 2020 WL 6290665, at *4 (S.D.N.Y. Oct. 27, 2020) (quoting *Jackson* v. *Waterbury Police Dep't*, No. 11 Civ. 642 (GWC), 2015 WL 5251533, at *9 (D. Conn. Sept. 8, 2015)); *see also, e.g., Sarnicola* v. *Cnty. of Westchester*, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002).

The Second Circuit has also applied the "reasonable suspicion" standard to visual body cavity searches, which are "even more intrusive" than strip searches and "require an arrestee not only to strip naked in front of a stranger, but also to expose the most private areas of her body to others." *Sloley*, 945

41

F.3d at 38.   As such, "a visual body cavity search conducted as an incident to a lawful arrest for any offense must be supported by a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity."  *Id.* (internal quotation marks omitted).

> **b.    The Court Denies Summary Judgment as to Plaintiff's Claim of Unlawful Strip Search and Cavity Inspection Against Alvarez and Fabrizi, But Grants as to Bonilla and Chow**

Plaintiff testified at his deposition that when he arrived at the 24th Precinct, he was "tak[en] to a separate cell and ... was told to strip, turn around, bend over, squat and cough." (Pl. Dep. 52:3-5).[9]  Contrary to Defendants' argument that Plaintiff's "own cited testimony ... never mentions a cavity inspection whatsoever" (Def. Reply 5), Plaintiff clearly describes a strip search and visual cavity inspection, as those terms have been defined in this Circuit.  *See Gonzalez*, 728 F.3d at 158.

Plaintiff alleges that both facets of the search that was performed on him at the precinct were unlawful.  (Pl. Opp. 24-25).  The Court finds there to be triable issues of fact as to the reasonableness of both the strip search and visual cavity inspection.  However, Plaintiff's claim survives only as to Alvarez

---

[9]     The version of Plaintiff's arrest report contained in the record does not reflect that he was subjected to a strip search.  (Arrest Report).  However, Fabrizi testified in his deposition that there existed documentation reflecting that a strip search had been conducted on Plaintiff.  (Fabrizi Dep. 107:13-23).  To the extent Defendants challenge that Plaintiff was strip-searched (*see* Def. Reply 5), the record evidence creates a triable issue of fact as to whether such a search occurred that precludes summary judgment on this issue.

and Fabrizi, who are the only officers for whom the record contains evidence that could support personal involvement in the search.

### i.     Reasonableness of the Search

Because there are triable issues of fact as to whether probable cause existed to arrest Plaintiff, there are necessarily questions of material fact as to the reasonableness of the strip search and visual cavity inspection that were performed on Plaintiff incident to this arrest. If a jury determines that Alvarez fabricated the exchange that purportedly justified Plaintiff's arrest, the record contains scant additional evidence giving the Officers any basis to search Plaintiff, let alone strip search him or perform a visual cavity inspection.

Even assuming the Officers had probable cause to arrest Plaintiff, there are genuine disputes of material fact regarding whether they had reasonable suspicion to believe that Plaintiff was concealing contraband. "A 'reasonable suspicion' of wrongdoing is something stronger than a mere 'hunch,' but something weaker than probable cause." *Varrone* v. *Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) (citation omitted). Whether a particular strip search is constitutional "turns on an objective assessment of the ... facts and circumstances confronting [the searching officer] at the time, and not on the officer's actual state of mind at the time" of the search. *Maryland* v. *Macon*, 472 U.S. 463, 470 (1985). "[B]eing arrested for a narcotics offense does not *automatically* give rise to a reasonable suspicion to justify a strip search and visual cavity inspection." *Carlos Quiles* & *Carlos Rodriguez* v. *City of New York*, No. 15 Civ. 1055 (CM), 2016 WL 6084078, at *11 (S.D.N.Y. Oct. 12, 2016).

Defendants do not present any argument that the strip search and inspection of Plaintiff was motivated by the Officers' reasonable suspicion that he was secreting contraband. Rather, Defendants rest their summary judgment argument on the contention that the search was performed incident to a lawful arrest (Def. Br. 9), and that the record does not establish that Plaintiff was subjected to a cavity inspection (Def. Reply 5). As already discussed, these arguments do not warrant granting summary judgment in favor of Defendants. Additionally, the Court is unable to discern any evidence in the record that could establish, as a matter of law, that Plaintiff's strip search and cavity inspection were justified by reasonable suspicion. Fabrizi testified in the abstract during his deposition that based on his training and experience, Plaintiff's arrest was the type that would warrant a strip search because it occurred in "a drug prone location" and because the Officers "were not able to recover any additional narcotics on the prisoner's person" despite "the fact that [Alvarez] said he saw the hand to hand [transaction]." (Fabrizi Dep. 108:2-13). Even if Defendants attempted to rest the reasonableness of the search and inspection on Fabrizi's testimony — which they have not — it would not suffice to show that the Officers possessed "*individualized* suspicion, specifically directed to the person who is targeted for the strip [or visual body cavity] search." *Hartline*, 546 F.3d at 100 (emphasis added); *see also Sloley*, 945 F.3d at 46 (noting that officers may have reasonable suspicion where the arrestee is fidgeting or making other suspicious movements; reaching or

44

attempting to reach his hands down his pants; or known to have previously secreted drugs).

ii.      **Personal Involvement**

Having shown there to be a dispute of material fact over the reasonableness of the strip search and cavity inspection, Petitioner must establish that each Officer was personally involved in the search for his unlawful search claim to survive. *See Victory*, 814 F.3d at 67. Plaintiff has adduced no evidence suggesting Bonilla's or Chow's personal involvement in the search. However, questions remain as to the personal involvement of Alvarez and Fabrizi.

Plaintiff asserts that "upon arrival at the 24th Precinct, [he] was subjected to a strip-search with an attendant cavity inspection by Det. Alvarez at the direction of Lt. Fabrizi." (Pl. Opp. 24). As support for the personal involvement of these individuals, Plaintiff cites to his own deposition testimony, recalling that Alvarez was likely present during his strip search. (Pl. Dep. 51:24-52:16), as well as Fabrizi's testimony, explaining that the arresting officer typically performs a strip search and that the search would have been performed at his direction (Fabrizi Dep. 108:14-24). The Court finds this testimony to create a triable issue of fact as to Alvarez's and Fabrizi's personal involvement in the allegedly unlawful search of Plaintiff at the police precinct.[10]

---

[10]    The Court reiterates that "there is no special rule for supervisory liability" under Section 1983 and that in order to hold a supervisor liable for an alleged constitutional violation under this provision, a plaintiff must show that the "Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti* v. *Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (citation omitted). In contrast to Plaintiff's false arrest claim, where there is no evidence suggesting that Fabrizi played an active

Defendants argue that Plaintiff's unreasonable search claim is based on evidence suggesting that Plaintiff was "likely" (as opposed to actually) strip-searched based on speculation from the nature and circumstances of his arrest.  (Def. Reply 5).  Although neither Alvarez nor Fabrizi specifically recalled the strip search and cavity inspection, Plaintiff does, and the officers' corresponding "lack of memory does not create a genuine issue of fact." *Edwards* v. *Macy's Inc.*, No. 14 Civ. 8616 (CM) (JLC), 2015 WL 4104718, at *6 (S.D.N.Y. June 30, 2015) (citing *F.D.I.C.* v. *Nat'l Union Fire Ins. Co. of Pittsburgh*, 205 F.3d 66, 75 (2d Cir. 2000)).  In the absence of any other evidence suggesting that Alvarez and Fabrizi were not involved in the search, Defendants' have failed to demonstrate the lack of a genuine dispute of material fact as to their personal involvement in this alleged constitutional violation.

Accordingly, Plaintiff's unlawful search claim may proceed as against Alvarez and Fabrizi.

### iii.        Qualified Immunity

What is more, Alvarez and Fabrizi are not entitled to qualified immunity on Plaintiff's unlawful search claim.  Where, as here, "the Fourth Amendment requires an officer to have reasonable suspicion before undertaking a search, an officer is entitled to qualified immunity unless we can say on the somewhat

---

role in effectuating Plaintiff's arrest, Fabrizi's own testimony suggests that he likely personally directed Plaintiff to be strip-searched at the precinct.  (Fabrizi Dep. 108:14-24).  This evidence is sufficient to suggest Fabrizi's personal involvement in the allegedly unlawful search and inspection.

unique facts before us that it is clearly established that no 'reasonable suspicion' justified a visual body cavity search." *Sloley*, 945 F.3d at 43 (internal quotation marks omitted). "Stated differently, qualified immunity is unavailable if 'no reasonable officer could have believed that there was reasonable suspicion.'" *Id.* (quoting *Dancy* v. *McGinley*, 843 F.3d 93, 108 (2d Cir. 2016)).

As there is a genuine dispute over whether Alvarez fabricated the foundation of the probable cause supporting Plaintiff's arrest, the Court cannot conclude that Alvarez and Fabrizi are entitled to qualified immunity on Plaintiff's unlawful search claim. No reasonable officer would believe it to be reasonable to perform a strip search and visual cavity inspection on an individual who had been arrested on false pretenses. *See, e.g., Falls* v. *(Police Officer) Detective Michael Pitt*, No. 16 Civ. 8863 (KMK), 2021 WL 1164185, at *28 (S.D.N.Y. Mar. 26, 2021) (denying qualified immunity to officers "in the absence of any evidence that has been held to support reasonable suspicion" in the context of a visual body cavity search).

Accordingly, Alvarez and Fabrizi are not entitled to qualified immunity on Plaintiff's unlawful search claim.

### 5. Abuse of Process

Plaintiff next brings an abuse of process claim, on the grounds that the Officers maliciously employed criminal process against him in violation of his right to due process. (Pl. Opp. 30). Defendants are entitled to summary judgment on this claim.

47

### a. Applicable Law

The elements of a Section 1983 cause of action for malicious abuse of process are supplied by state law. *See Cook* v. *Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). In New York, a malicious abuse of process claim may proceed when a defendant "[i] employed regularly issued legal process to compel performance or forbearance of some act, [ii] with the intent to do harm without excuse or justification, and [iii] in order to obtain a collateral objective that is outside the legitimate ends of the process." *Arrington* v. *City of New York*, 628 F. App'x 46, 49 (2d Cir. 2015) (summary order) (internal alterations omitted) (quoting *Savino*, 331 F.3d at 76). "'[L]egal process means that a court issued the process, and the plaintiff will be penalized if he violates it,' such as an arraignment." *Sforza* v. *City of New York*, No. 07 Civ. 6122 (DLC), 2009 WL 857496, at *16 (S.D.N.Y. Mar. 31, 2009) (quoting *Cook*, 41 F.3d at 80). By itself, a "warrantless arrest[ ] does not involve legal process." *Id.* at *17.

The third element — a collateral objective — is "[t]he crux of a malicious abuse of process claim[.]" *Marshall* v. *Port Auth. of N.Y. & N.J.*, No. 19 Civ. 2168 (WHP), 2020 WL 5633155, at *8 (S.D.N.Y. Sept. 21, 2020) (quoting *Douglas* v. *City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009)). "To meet this element, a plaintiff must prove not that [the] defendant acted with an improper *motive*, but rather an improper *purpose* — that is, 'he must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Douglas*, 595 F. Supp. 2d at 344 (emphases added) (quoting *Savino*, 331 F.3d at 77). The torts of abuse of process and malicious

48

prosecution are closely related, although there is a key distinction: "[w]hile [the latter], concerns the improper issuance of process, the gist of abuse of process is the improper use of process after it is regularly issued." *Cook*, 41 F.3d at 80 (internal quotation marks and alterations omitted). As such, "[t]he pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." *Feliz* v. *City of New York*, No. 19 Civ. 6305 (AJN), 2022 WL 446043, at *8 (S.D.N.Y. Feb. 14, 2022) (citation omitted).

### b.   The Court Grants Summary Judgment as to Plaintiff's Malicious Abuse of Process Claim

Defendants challenge the "collateral objective" element of Plaintiff's abuse of process claim. (Def. Br. 12-13). On this point, Defendants contend that even if the Officers had some collateral objective in arresting Plaintiff, there is no evidence that any Defendant took any action in furtherance of that ancillary objective *after* initiating Plaintiff's prosecution. (*Id.*). The Court agrees with Defendants, and thus grants summary judgment as to Plaintiff's claim for abuse of process.

Plaintiff contends that the Officers arrested and prosecuted him in pursuit of their "collateral objective ... to seize and search Ms. Gasparro." (Pl. Opp. 30). As support for this collateral objective, Plaintiff points to Defendants' willful failure to inquire into the source of Gasparro's drugs, when they had reason to know she did not acquire them from Plaintiff. (*Id.*). This does not suffice to make out a cognizable collateral objective that could sustain Plaintiff's malicious abuse of process claim. Plaintiff makes no effort to explain

49

how Defendants' employment of criminal process could possibly have been geared toward this collateral objective, when Defendants had already seized and searched Gasparro by the time criminal process was issued. In essence, Plaintiff impermissibly seeks to recycle his theory of false arrest to sustain a malicious abuse of process claim. Plaintiff has pointed to no action taken by any Defendant subsequent to the initiation of legal process that evinces a collateral purpose beyond or in addition to his criminal prosecution. To the extent Plaintiff's argument may be construed as seeking to hold Defendants liable for employing legal process with the true aim of falsely prosecuting Gasparro, this contention finds no support in the record.

Accordingly, summary judgment is granted on Plaintiff's malicious abuse of process claim.

### 6.    Failure to Intervene

Plaintiff brings a Section 1983 claim against the Officers for their failure to intervene to prevent the alleged violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. (Compl. ¶¶ 133-136). Defendants have not addressed Plaintiff's failure to intervene claim in their motion for summary judgment, and have thus proffered little going toward their burden of demonstrating "the absence of a genuine issue of material fact" as to these claims. *Celotex*, 477 U.S. at 323. Nevertheless, the Court's review of the record and consideration of the parties' arguments with respect to Plaintiff's false arrest, unlawful search, and malicious prosecution

claims leads the Court to deny summary judgment on Plaintiff's failure to intervene claims as to all of the Officers.

### a.    Applicable Law

Law enforcement officers have an affirmative duty to intervene to prevent their fellow officers from infringing on a citizen's constitutional rights. *Rodriguez*, 291 F. Supp. 3d at 417 (citing *Guerrero* v. *City of New York*, No. 16 Civ. 516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017)); s*ee also Sloley*, 945 F.3d at 46-47.  An officer can be liable under Section 1983 where "[i] the officer had a realistic opportunity to intervene and prevent the harm; [ii] a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and [iii] the officer does not take reasonable steps to intervene."  *Guerrero*, 2017 WL 2271467, at *3.

"Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'"  *Terebesi* v. *Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (quoting *Anderson* v. *Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality."  *Figueroa*, 825 F.3d at 106 (quoting *O'Neill* v. *Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988)).  "In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other

considerations." *Id.* at 107. "Failure-to-intervene claims can arise out of a limitless variety of factual scenarios." *Id.*

It is well established that a plaintiff may not state a claim for failure to intervene against an officer who directly participated in the allegedly unlawful conduct. *See Case* v. *City of New York*, 233 F. Supp. 3d 372, 402 (S.D.N.Y. 2017) ("[A] defendant 'cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation.'" (quoting *Marom*, 2016 WL 916424, at *19)); *accord Sanabria* v. *Detective Shawn Tezlof*, No. 11 Civ. 6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016).

### b. The Court Denies Summary Judgment as to Plaintiff's Failure to Intervene Claim

As previously discussed, Plaintiff has established genuine disputes of material fact with respect to his claims of false arrest, malicious prosecution, and unlawful search. The record demonstrates that each of the Officers played different roles (and sometimes no role at all) in these alleged violations of Plaintiff's constitutional rights. Notwithstanding the parties' failure to provide briefing on Plaintiff's failure to intervene claims, the Court independently assesses the record to determine whether there are triable issues of fact as to whether any of the Officers failed to intervene to prevent the infringement of Plaintiff's rights. As the ensuing analysis reveals, there are factual disputes as to each of the Officers on at least some of Plaintiff's alleged violations.[11]

---

[11]   Because Defendants do not address Plaintiff's failure to intervene claims, the Court declines to consider whether the Officers are entitled to qualified immunity for their

###### i.      Alvarez

The record suggests that Alvarez played a central role in the events giving rise to Plaintiff's surviving Section 1983 claims.  Alvarez was the only officer who allegedly witnessed the critical exchange between Plaintiff and Gasparro (Alvarez Dep. 46:7-21, 68:13-20), and was the officer who signed the criminal complaint charging Plaintiff with narcotics offenses (Criminal Complaint).  These undisputed facts permit the Court to determine, as a matter of law, that Alvarez was sufficiently directly involved in Plaintiff's alleged false arrest and malicious prosecution so as to foreclose liability for Alvarez's failure to intervene in these same violations.  *See Anderson*, 17 F.3d at 557 ("[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by *other* law enforcement officers in their presence." (emphasis added)).

Plaintiff also testified that Alvarez was likely present during Plaintiff's strip search and visual cavity inspection.  (Pl. Dep. 51:24-52:16).  It remains unclear, however, whether Alvarez was the officer who performed the allegedly unlawful search, or whether he was merely a bystander who declined to intervene while another officer impermissibly searched Plaintiff.  Therefore, a triable question of fact exists concerning the extent of Alvarez's direct participation in Plaintiff's strip search and visual cavity inspection.  *See*

---

failure to intervene.  *See Ariz. Premium Fin. Co.* v. *Employers Ins. of Wausau*, 586 F. App'x 713, 716 (2d Cir. 2014) (summary order) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out." (quoting *Monahan* v. *N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000))).

*Aguirre*, 2017 WL 4236552, at *13 ("Because there are genuine issues of material fact as to the extent of each officer's participation in the alleged misconduct, Defendants are not entitled to summary judgment on Plaintiff's failure to intervene claim on this basis.").

Accordingly, Alvarez is not entitled to summary judgment on Plaintiff's failure to intervene claim, to the extent this claim is related to his search and inspection.

### ii.    Bonilla

The record suggests that, compared to Alvarez, Bonilla played a less active role in Plaintiff's arrest, search, and prosecution.  Bonilla was a member of the field unit that arrested Plaintiff, but he did not observe Plaintiff interact with Gasparro, and he only arrived at the scene of the arrest after Plaintiff was taken into custody.  (Bonilla Dep. 16:3-13, 26:22-27:9).  Bonilla claims that he was the officer who filled out Plaintiff's arrest report and invoiced the property voucher for the narcotics recovered from Gasparro.  (*Id.* at 65:12-66:19; Gasparro Property Invoice)).  There is no evidence in the record suggesting that Bonilla was involved in, or even knew about, Plaintiff's strip search or cavity inspection.

The Court relied on this record evidence in determining that triable issues of fact existed as to whether Bonilla directly participated in Plaintiff's false arrest and malicious prosecution.  On this record, a reasonable jury crediting Plaintiff's version of events could find Bonilla liable for the support functions he played in facilitating Plaintiff's arrest, as well as for documenting

a false narcotics exchange in the arrest report that was likely sent to the District Attorney's office.  While liability for failure to intervene in Plaintiff's arrest or prosecution may not coexist with Bonilla's liability for these same violations on a theory of direct participation, at this stage in the proceedings, the undisputed facts do not allow the Court to conclude, as a matter of law, that Bonilla was a direct participant in Plaintiff's false arrest and malicious prosecution.  *See Aguirre*, 2017 WL 4236552, at *13.

Because a reasonable jury could find that Bonilla failed to intervene, as opposed to directly instigated, Plaintiff's false arrest and malicious prosecution, the Court denies summary judgment on Plaintiff's failure to intervene claim as to Bonilla on these grounds.  At the same time, the record does not contain any evidence suggesting that Bonilla was ever in a position to intervene in Plaintiff's strip search and cavity inspection.  Thus, to the extent Plaintiff's failure to intervene claim against Bonilla rests on his failure to intervene in the search and inspection, it cannot survive.

### iii.        Chow

Chow was the officer who detained and handcuffed Plaintiff at the scene of the arrest.  (Chow Dep. 32:12-17).  This constitutes direct participation in Plaintiff's arrest, and thus Chow cannot be held liable for failing to intervene in an arrest that he effectuated.  As to Plaintiff's search, there is no record evidence suggesting that Chow was ever in a position to intervene in the alleged search and inspection.  Chow testified that he recalls Plaintiff's being searched at the precinct, which search was limited to a pat-down of his pockets and

person.  (*Id.* at 75:15-24).  Chow specifically denies that Plaintiff was strip-searched upon arriving at the precinct.  (*Id.* at 75:25-76:12).  Consequently, the Court grants summary judgment on Plaintiff's false arrest claim as to Chow to the extent it is predicated on Chow's failure to intervene in Plaintiff's unlawful search and inspection.

By contrast, the Court declines to grant summary judgment to the extent Plaintiff's claim is predicated on Chow's failure to intervene in Plaintiff's prosecution.  Unaided by argument from Defendants, the Court believes that a reasonable jury could infer from the record evidence suggesting that Chow provided information to the District Attorney about Plaintiff's arrest and testified in proceedings in Plaintiff's criminal case, including before the grand jury, that he failed to take advantage of a reasonable opportunity to intervene in Plaintiff's malicious prosecution.  (Chow Dep. 69:18-20, 70:23-71:20; Pl. Dep. 67:8-68:20).

### iv.    Fabrizi

Lastly, the Court finds there to be a genuine dispute of material fact as to whether Fabrizi failed to act in the face of a duty to intervene in Plaintiff's arrest, search, and prosecution.

As previously mentioned, Fabrizi was the supervising lieutenant who possessed oversight responsibility for the field unit that arrested Plaintiff. (Fabrizi Dep. 116:6-9).  Documents associated with Plaintiff's arrest reflects that Fabrizi approved Plaintiff's arrest and verified the property that was recovered from both Plaintiff and Gasparro.  (Arrest Report; Gasparro Property

Invoice; Garcia Decl., Ex. G-H).  Fabrizi does not recall being at the scene of the arrest when Plaintiff was detained, but he testified that it was customary for him appear at an arrest scene to approve the arrests effectuated by his unit. (Fabrizi Dep. 106:19-23).  In the absence of any argument to the contrary, the Court finds Fabrizi's testimony regarding his usual practice of approving arrests to create a triable issue of fact as to whether Fabrizi forwent an opportunity to inhibit the violation of Plaintiff's constitutional rights when the unit he supervised arrested Plaintiff.

The Court also concludes that triable issues of fact exist as to whether Fabrizi failed to intervene in Plaintiff's unlawful search and malicious prosecution.  Fabrizi testified that if Plaintiff was, in fact, strip-searched, it would have been done at his direction.  (Fabrizi Dep. 108:21-24).  At the same time, Fabrizi does not specifically recall ordering a strip search and cavity inspection of Plaintiff, which prevents the Court from discerning whether Fabrizi's degree of personal involvement in the search was sufficient to foreclose liability on a failure to intervene theory.  In addition, although Fabrizi did not initiate Plaintiff's prosecution, the record suggests that he participated in subsequent stages of Plaintiff's criminal case, including by providing testimony (Pl. Dep. 67:8-68:20), and may have been able to deter Plaintiff's allegedly fraudulent prosecution.  Without the benefit of argument from Defendants, the Court concludes that a reasonable jury could find that Fabrizi failed to intervene in Plaintiff's malicious prosecution.

As such, Fabrizi is not entitled to summary judgment on Plaintiff's failure to intervene claim with respect to any of Plaintiff's surviving constitutional violations.

## C.    Plaintiff's Section 1983 Claim for Municipal Liability

Separately, Plaintiff seeks to hold the City responsible for the alleged violation of his Fourth Amendment rights stemming from his strip search and cavity inspection.  (Pl. Opp. 30-31).  The Court grants summary judgment on this claim, as Plaintiff has failed to adduce any evidence suggesting that the municipality maintained a policy or practice of performing unconstitutional searches.

### 1.    Applicable Law

"To hold a [municipality] liable under [Section] 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: [i] an official policy or custom that [ii] causes the plaintiff to be subjected to [iii] a denial of a constitutional right."  *Lucente* v. *Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (citation omitted); *see also Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  "[A] municipality cannot be made liable [under Section 1983] by application of the doctrine of *respondeat superior*," *Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 478 (1986), but rather the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury," *Roe* v. *City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (citation omitted).

Under *Monell*, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick* v. *Thompson*, 563 U.S. 51, 61 (2011).  In order to establish *Monell* liability based upon a "persistent and widespread" practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Lucente*, 980 F.3d at 297-98 (quoting *Sorlucco* v. *N.Y.C. Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)). "[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]." *Bowen* v. *Cnty. of Westchester*, 706 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (quoting *Newton* v. *City of New York*, 566 F. Supp. 2d 256, 270-71 (S.D.N.Y. 2008)); *see also Tuttle*, 471 U.S. at 823-24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

### 2.    The Court Grants Summary Judgment as to Plaintiff's *Monell* Claim

Plaintiff submits that he was subjected to an unlawful strip search and cavity inspection "due to an overarching official or unofficial policy espoused or at least tacitly approved or condoned by the policymakers or high-ranking officials of the City of New York or its police department[.]"  (Pl. Opp. 31).  Defendants attest that Plaintiff's only support for an unconstitutional

municipal policy is his own allegedly unlawful search.  (Def. Br. 18).

Defendants further argue that Plaintiff's theory of municipal liability invites the

Court to fill in virtually all of its crucial details (*e.g.*, whether the policy is

official or unofficial; actually or tacitly implemented; or condoned by

policymakers or other officials) and is thus fatally imprecise.  (Def. Reply 8).

The Court agrees with Defendants that Plaintiff's *Monell* claim fails as a matter

of law.

Plaintiff argues that, in addition to his own allegedly unlawful search and

cavity inspection, the testimony of Fabrizi and Alvarez lends additional support

to the existence of an unconstitutional policy within the NYPD of performing

unreasonable searches and inspections.  (Pl. Opp. 31).  Plaintiff overstates the

import of both officers' testimony.  For his part, Fabrizi explained that certain

aspects of Plaintiff's arrest led him to believe that a strip search was

appropriate, including that the arrest was made in a drug-prone area and that

an officer claimed to have seen a narcotics exchange, but was unable to recover

any drugs.  (Fabrizi Dep. 108:7-13).  And Alvarez merely testified that he

perceived Plaintiff's arrest to be one that "most likely" would entail a strip

search because "[u]sually a drug dealer who sells narcotics hide[s] narcotics in

the private parts area."  (Alvarez Dep. 164:19-165:4).  These bits of testimony

come nowhere close to describing a municipality-wide policy of

unconstitutional searches or a practice of unconstitutional conduct that was so

persistent and widespread as to practically have the force of law.  Even

assuming Alvarez testified to an overbroad conception of the types of searches

that are permissible incident to drug arrests, there is no evidence to suggest that he derived his misunderstanding from any municipal policy, whether explicit or implicit.  Indeed, Fabrizi's testimony describes precisely the kind of considerations that are appropriate for law enforcement officers to assess when determining the reasonableness of a search.

Whether it was reasonable for Plaintiff to be strip-searched and inspected on the circumstances of this case is a distinct question that this Court has already determined is appropriately resolved by a jury.  At the same time, this record does not create any genuine dispute as to whether Plaintiff's allegedly unconstitutional search was performed pursuant to a municipal policy or practice.  Accordingly, summary judgment is granted as to Plaintiff's claim for municipal liability pursuant to Section 1983.

**D.     Plaintiff's State Law Claims**

In addition to his claims brought under Section 1983, Plaintiff asserts state law causes of action against all Defendants for false arrest, assault and battery, malicious prosecution, malicious abuse of process, and failure to intervene.[12]  Defendants argue that most of Plaintiff's state law claims are procedurally barred for failure to comply with the requirements of New York General Municipal Law Sections 50-e and 50-i.  (Def. Br. 20).  The Court concludes that summary judgment is appropriate to all of Plaintiff's state law

---

[12]     "Unlike cases brought under [Section] 1983, municipalities may be liable for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat superior*."  *Biswas* v. *City of New York*, 973 F. Supp. 2d 504, 539 (S.D.N.Y. 2013) (quoting *L.B.* v. *Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002)).

claims, except those related to his malicious prosecution and failure to
intervene in his criminal proceeding.

### 1.    Plaintiff's State Law Claims for False Arrest, Assault and Battery, and Abuse of Process Are Untimely

"Under New York law, a plaintiff asserting tort claims against the City or
its employees must file a notice of claim within ninety days after the incident
giving rise to the claim and commence the action within a year and ninety days
from the date of the incident." *Brown* v. *City of New York*, No. 18 Civ. 3287
(JPO), 2020 WL 1819880, at *7 (S.D.N.Y. Apr. 9, 2020) (citing N.Y. Gen. Mun.
Law §§ 50-e(1)(a), 50-i(1)).  New York law provides that a "notice of claim is a
statutory precondition to filing suit against the City or its employees." *Harris* v.
*Bowden*, No. 03 Civ. 1617 (LAP), 2006 WL 738110, at *6 (S.D.N.Y. Mar. 23,
2006); *see also Hardy* v. *N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d
Cir. 1999) (explaining that in federal court, state notice-of-claim statutes apply
to state law claims).  A plaintiff's "failure to comply with the mandatory New
York statutory notice-of-claim requirements generally results in dismissal of
his claims." *Warner* v. *Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175
(S.D.N.Y. 2003); *see also Matthews* v. *City of New York*, 889 F. Supp. 2d 418,
448 (E.D.N.Y. 2012) ("New York state courts strictly construe Notice of Claim
requirements").

Plaintiff filed a notice of claim on July 27, 2018 (Notice of Claim), and
commenced this action on July 19, 2019 (Complaint).  As discussed below,
both Plaintiff's notice of claim and his initiation of this suit were untimely as to
Plaintiff's state law claims for false arrest, assault and battery, and abuse of

process under New York General Municipal Law Sections 50-e and 50-i. As such, Defendants are entitled to summary judgment on these state law claims.[13]

### i.      False Arrest

Defendants claim that Plaintiff's cause of action for false arrest accrued at the time of his arrest (Def. Br. 20); however, New York law provides that "a cause of action for the tort of false imprisonment accrues … on the date of the prisoner's release from confinement." *Lynch* v. *Suffolk Cnty. Police Dep't, Inc.*, 348 F. App'x 672, 676 (2d Cir. 2009) (summary order) (internal quotation marks omitted) (quoting *Jackson* v. *Police Dep't of the City of N.Y.*, 500 N.Y.S.2d 553, 554 (2d Dep't 1986)); *see also Mitchell* v. *Home*, 377 F. Supp. 2d 361, 378 (S.D.N.Y. 2005) (holding that a cause of action for false arrest "accrues when a plaintiff is released from pre-arraignment custody"). According to Plaintiff's arraignment form, Plaintiff was released on bail on September 1, 2016 (Pl. Arraignment Form), meaning his deadline to file a notice of claim was November 30, 2016, and his deadline to file a lawsuit was November 30, 2017. Because Plaintiff met neither of these deadlines, Defendants are entitled to summary judgment on Plaintiff's state law claim for false arrest.

---

13      Plaintiff does not address Defendants' argument regarding his failure to comply with New York's notice of claim requirement and the applicable statute of limitations. Nor is there any indication that Plaintiff ever sought leave to file a late notice of claim. *See* N.Y. Gen. Mun. Law § 50-e(7) (providing that an application for leave to serve a late notice of claim shall be made to "the supreme court or to the county court"). Therefore, the Court must dismiss Plaintiff's untimely state law tort claims. *See Gibson* v. *Comm'r of Mental Health*, No. 04 Civ. 4350 (SAS), 2006 WL 1234971, at *5 (S.D.N.Y. May 8, 2006) ("Federal courts do not have jurisdiction to hear complaints from plaintiffs who have failed to comply with the notice of claim requirement, or to grant permission to file a late notice.").

ii.      **Assault and Battery**

Plaintiff's state law claims for assault and battery accrued on August 31, 2016, the date Defendants are alleged to have unlawfully taken him into custody. *See, e.g., Rateau* v. *City of New York*, No. 06 Civ. 4751 (KAM) (CLP), 2009 WL 3148765, at *14 (E.D.N.Y. Sept. 29, 2009) ("[C]auses of action for assault and battery [under New York law] accrue immediately upon the occurrence of the tortious act[.]").  Thus, Plaintiff's deadline to file a notice of claim for this claim was November 29, 2016, and his deadline to file suit was November 29, 2017.  Plaintiff failed to satisfy either of these deadlines.  As such, Defendants are entitled to summary judgment on Plaintiff's state law claim for assault and battery.

iii.      **Abuse of Process**

Plaintiff's state law abuse of process claim is also untimely.  This claim accrued when the criminal process was set in motion.  *See Wright* v. *City of New York*, No. 18 Civ. 10769 (DLC), 2019 WL 2869066, at *3 (S.D.N.Y. July 2, 2019) ("A claim for abuse of process accrues at such time as the criminal process is set in motion, unless the plaintiff is unaware of facts supporting the claim." (citing *Cunningham* v. *State of New York*, 53 N.Y.2d 851, 853 (1981)); *accord Pinter* v. *City of New York*, 976 F. Supp. 2d 539, 570 (S.D.N.Y. 2013).  As discussed above, Plaintiff's malicious abuse of process claim is rooted in Defendants' alleged collateral objective of seizing and searching Gasparro.  (Pl. Opp. 30).  This collateral objective was accomplished contemporaneously with Plaintiff's arrest, and thus accrued at that time, on August 31, 2016.  As such,

Plaintiff's deadline to file a notice of claim for this claim was November 29, 2016, and his deadline to file suit was November 29, 2017.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's state law abuse of process claim.

### 2.    The Court Denies Summary Judgment as to Plaintiff's State Law Malicious Prosecution Claim

Defendants do not contest that Plaintiff's state law malicious prosecution claim was timely filed (Def. Br. 20), as it accrued on May 15, 2018 (Pl. Certification of Disposition), the day his criminal charges were dismissed, *see Breton* v. *City of New York*, 404 F. Supp. 3d 799, 809 (S.D.N.Y. 2019) (explaining that for purposes of evaluating the timeliness of a notice of claim filed pursuant to General Municipal Law Section 50-e, a "claim for malicious prosecution [does] not accrue until the charges against the plaintiff [are] dismissed").

The Court has already found there to be genuine disputes of material fact as to Plaintiff's malicious prosecution claim brought under Section 1983. Although claims for malicious prosecution under federal and state law are not coextensive, *see Lanning* v. *City of Glen Falls*, 908 F.3d 19, 24-29 (2d Cir. 2018) (clarifying that "federal law defines the elements of a [Section] 1983 malicious prosecution claim, and that a State's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements"), the Court is aware of no authority — state or federal — that would yield divergent conclusions on Plaintiff's state and federal malicious prosecution claims.  Just as in the Section 1983 context, there are triable

issues of fact as to whether Alvarez and Bonilla initiated Plaintiff's prosecution based on a fabricated narcotics exchange.  Moreover, there is a genuine dispute as to whether Bonilla, Chow, or Fabrizi had a reasonable opportunity to intervene in Plaintiff's allegedly malicious prosecution.

Accordingly, for substantially the same reasons as discussed in the Section 1983 context, the Court denies summary judgment on Plaintiff's state law malicious prosecution claim as to Alvarez and Bonilla.  Similarly, the Court denies summary judgment on Plaintiff's state law failure to intervene claim as to Bonilla, Chow, and Fabrizi, albeit only on the theory that they failed to intervene in Plaintiff's prosecution.  Summary judgment is denied to the City of New York on both claims under a theory of *respondeat superior*.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The claims that remain for trial are as follows:

- False Arrest (Section 1983): against Alvarez, Bonilla, Chow, and Fabrizi;

- Malicious Prosecution (Section 1983): against Alvarez and Bonilla;

- Malicious Prosecution (New York State Law): against Alvarez and Bonilla, along with a *respondeat superior* claim against the City;

- Unlawful Search (Section 1983): against Alvarez and Fabrizi;

- Failure to Intervene (Section 1983): against Alvarez regarding the search; against Bonilla regarding the arrest and prosecution; against Chow regarding the prosecution; and against Fabrizi regarding the arrest, search, and prosecution; and

- Failure to Intervene (New York State Law): identical to federal claim, along with a *respondeat superior* claim against the City.

The Clerk of Court is directed to terminate the pending motion at docket entry 67.  The parties are directed to submit a joint status letter regarding proposed next steps on or before **April 11, 2022**.

SO ORDERED.

Dated:     March 11, 2022
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge